Good morning. May it please the Court, I'm Lauren Goldman for Appellant Facebook. I'd like to reserve five minutes for rebuttal, but I recognize that that's on me. Please watch the clock. The plaintiffs in this case are seeking billions of dollars because of an optional Facebook feature that allows people to more easily tag their friends in photos. The class certification order should be reversed for three reasons. The first is that the case should have been dismissed altogether for lack of Article III standing because the plaintiffs concede that they have suffered no real-world harm as a result of Facebook's analysis of their photos. Second, common issues don't predominate because to invoke BIPA in the first instance, each plaintiff will have to make an individualized, fact-intensive showing that the circumstances relating to his particular claim arose primarily and substantially in Illinois, and that defeats predominance. Third, a class action in this case violates both Rule 23's superiority requirement and due process because it could lead to an enormous statutory damages award that is untethered to any injury and contrary to legislative intent. And I'd like to turn to Article III standing first. This Court has repeatedly held since Spokio that Article III requires the plaintiff to show a concrete injury causally connected to the statutory violation. That's from this Court's decision in Dutta. Basically, a plaintiff has to show that something bad happened to him in the real world as a result of the defendant's conduct. So the opposing counsel and the district court and our case law says that an invasion of privacy is sufficient by itself and that the injury here is an invasion of privacy because of this facial mapping. I forgot what they're called, the facial maps. So why isn't that enough? We've said there's an interest in privacy, which is a concrete interest that has long been protected in the law, and in that case, any violation is enough. There are a couple of problems with that argument. First, the case in which this Court said that an invasion of privacy enough was Eichenberger, and Eichenberger explains exactly why this case doesn't qualify. In Eichenberger, the defendant was ESPN, collected the plaintiff's PII and shared it with another company, which then analyzed that data, combined it with other data about the plaintiff, and sold it back to the defendant for use in advertising. So there was disclosure of the plaintiff's data. There's no disclosure here. So is disclosure required in your view? Well, this Court said in Bassett that it is required. Well, disclosure wasn't an invasion of privacy. It was a publication of the credit card information on the receipt that couldn't do any harm unless it got into the wrong hands. So here, Facebook has a tool which can find, sort of like CSI, can find pictures of someone if they got a photo off of a surveillance camera. They have a tool that could find who that person is in the photo and every friend he has. I mean, clearly that's a different sort of situation. But nobody's alleging that Facebook did that. But they have the capability of doing it, is what the opposing counsel says. Well, they don't allege that. What they allege is that Facebook used this data to suggest that their friends, who already know what they look like, tagged them in photos. That's the only allegation here.  Of course, Your Honor. What non-FCRA case or FACTA case supports Facebook's position? You reference Bassett, Duda, and others, but they're all ones that talk about a procedure, such as the efforts that should be made to reasonably report credit information. What do you have beyond those cases that I see as distinct that supports Facebook's position? So two things, Your Honor. One is that everybody here agrees that these are procedural violations. Nobody is saying ---- I'm not so sure that everyone does, and even if they do, the party absent from this room is the Supreme Court of the State of Illinois, that admittedly after much of the briefing in this case was done, but presumably have answered the question Facebook poses. And I really like ñ I know what you say in your reply, but I wonder what case you have that supports your position. Even Rivera that was issued just before Rosenbach, in my eyes, doesn't seem to bend towards Facebook. Okay. So a couple things about Rosenbach. First, paragraph 34 of Rosenbach specifically says that the notice and consent provisions at issue here are procedural. And at paragraph 37, there's a footnote or hyperlope that says this is the point of the law, to require individuals to wait until they have sustained some compensable injury beyond violation of their statutory rights, which I think you just referred to, before they may seek recourse, as defendants urge, would be completely antithetical to the act's preventative and deterrent measures. And you applaud the preventative and deterrent measures, but you seem to dismiss the rest of it. And I'd really like your help knowing why. Sure. So in Spokio, and in this Court's cases applying Spokio, the courts have consistently said, and Rivera is the case that's directly on point, that finds no Article III standing injury here. So these cases hold that a violation of a statute ñ what Rosenbach was about, was about whether the violation of the statute standing by itself could support the aggrieved requirement in the statute. And the Court said to be aggrieved, you don't need to show anything more than a violation of these notice and consent provisions. The Court did not suggest ñ the Court specifically said, people can bring preventative lawsuits before any compensable injury has been suffered. But what this Court says is that a preventative lawsuit is not sufficient absent a showing of certainly impending harm. And there's been no such showing here. The plaintiffs didn't even argue in the district court that ñ Your position that the creation of a biometric scan and the creation of this tool is not an invasion of privacy. That's your position? Correct, Your Honor. And ñ So there's no invasion of privacy until information is disclosed to a third party. Or misused. And do you have a case for that? Because, you know, Eichenberger says the right to privacy is a common law historical right and is violated merely by a violation of the statute. Right. But the statute in that case was a substantive statute and the defendant disclosed the plaintiff's information to third parties. Those are the two factors that directly distinguish Eichenberger from this case. And they make it very different. So in Rivera, the Judge Chang from the Northern District of Illinois, carefully walked through all of the common law privacy causes of action and concluded that none of them are similar to this situation. Because what you're doing is you're taking a photograph of somebody's face, which is public information, you walk around with your face showing all day long, and you're analyzing it. And creating a map that can find it. I mean, the Supreme Court in Carpenter and other cases, obviously, not directly on point in the Fourth Amendment context, says that when you can multiply the effect of what a normal human being can do to the extent that it gives an incredible additional amount of information, that has to be analyzed separately. So Riley Carpenter, that line of cases, says these technologically enhanced invasions of privacy are different. So I guess the question here really is, is there any case that would foreclose saying that Facebook's tool and the potential use of it and use of it is not an invasion of privacy, even though it's new? The combination of Spokio and Clapper, Your Honor, and I would ask the Court to look at Rivera and the authorities cited in that case for the proposition that, and this Court's decision in Bassett, which said that you have to point to a disclosure. And the Court said without disclosure, it makes no difference that these types of injuries were recognized at common law. The other thing that's important to consider here is that everybody agrees that the plaintiffs are bound by Facebook's disclosures. The district court held an evidentiary hearing and found that they had agreed to Facebook's terms, which disclosed this feature. It says we are able to suggest that your friend tag you in a picture by comparing your friend's pictures to information we've put together from your profile pictures and the other photos in which you've been tagged. Well, consent is a defense, right, that you complied with. I'm not sure why that detracts from their Article III standing. Because they are saying that Facebook infringed their right to say no. If Your Honor is going to treat this as a policy, as a privacy harm, you have to look at what the privacy harm is. Plaintiffs are not alleging that Facebook took any information that they did not want Facebook to have. They agreed to Facebook's terms. Facebook's terms disclosed this feature. And plaintiffs don't say, look, if you had given us better disclosures, we would have said no. We would have opted out. We wouldn't have joined Facebook. They don't say any of that. In fact, they say they really like the feature. In fact, they say they really like the feature. One of them did. Yes. So that is the point, Your Honor. You can't walk into Federal court and say, I really like this feature. I know how to opt out. I'm choosing to keep the feature on, but give me $1,000. If you felt as if it violated your privacy, you could opt out. If the plaintiffs came in and said, you know, you disclosed it poorly, and if you had said something different, I would have opted out. I would have made a different decision. They have to show that the delta between Facebook's disclosures and what they are saying BIPA requires made a difference in their real lives. That's the thrust of data, Your Honor. But isn't that really what the 23B3 analysis is designed to ferret out? And discovery could assist with that, to identify those who knew the risks but yet decided not to opt out of the feature. It doesn't mean the entire case has no position, whether it's Federal or State court, does it? Well, first of all, these plaintiffs don't allege that that delta made a difference to them, so they lack standing. We don't think anybody would have standing. But if the court thinks that somebody could have standing by coming in and making different allegations, that would be an individualized issue that would bar class certification. Because even if you can have a class action where one class rep has standing as a matter of Article III, you can't proceed that way as a matter of Rule 23. Everybody agrees, the Supreme Court has said, and I'm sure this Court would agree, that people who don't have standing can't recover damages in Federal court. If you're going to need mini-trials to have every single person come in and say, gee, I didn't understand those disclosures, if you had told me something better, I would have opted out. If you have to do that before you pay anybody damages, you can't have a class action. Well, I guess there's a question whether the disclosure constitutes consent for purposes of FIFA, and that would be a question or an issue that would be common across the class. Yes, but the presence of common issues is not enough to satisfy Rule 23. Common issues have to predominate. And if you need a procedure where everybody's Article III standing needs to be assessed individually before any judgment can be entered or paid, you don't have predominance. Well, do you want to discuss your arguments against the class certification? I very much do, Your Honor. So the other big problem with this class action is extraterritorially. Everybody agrees that FIFA does not apply extraterritorially. And under Illinois law, that's a policy decision by the General Assembly to apply this statute only to conduct and violations that arise primarily and substantially within the State of Illinois. Now, in most FIFA cases, that's not a big problem because everything's going to happen right in Illinois because it happens in person. You've got the plaintiff and the defendant and the disclosures and the collection and the storage all happening at the defendant's place of business in Chicago or whatever. The violation of FIFA, I guess, comes when the person's photos, the people recognized or located in Illinois, their faces are scanned and they're not without their consent and a map is created without their consent. So that's the without notice and consent. So the violation of FIFA would thus be arguably within Illinois. So why isn't that? And the class is Facebook users located in Illinois for whom Facebook created and stored a face template. Well, I want to take a step back. It's not clear that that's when the violation is happening. A couple things. One is that Facebook performs facial recognition analysis and stores the results on its servers, which are not in Illinois. Sure. But let's say per hypothesis that the Illinois courts could determine or the district court could determine as a single question that the violation occurs in Illinois when their face templates are created without notice and consent. But the creation of the face templates is not happening in Illinois and we don't even know that the plaintiff is in Illinois at the time. The fact that the plaintiff is a resident of Illinois is not a proxy. Because the class is defined as users located in Illinois for whom Facebook created and stored a face template. There are no cases saying that the violation just happens to happen where the plaintiff is. For example, you could as easily frame the violation as happening when the plaintiff signs up for Facebook and receives the disclosures that the plaintiffs are saying are faulty. That could be one of our class reps signed up for Facebook in Arizona, not in Illinois. In addition, in every case, these in-state factors. Is there any case that says the violation couldn't happen in Illinois? I mean, why wouldn't that be a reasonable determination for the district court to make? Well, it's not a determination that the district court did make. And Vulcan Gulf is a great example. It's a district court case from Illinois applying this extraterritoriality doctrine. And the defendants were located in California. The plaintiffs were located and injured in Illinois. And the court said, no, there's not enough ties to Illinois. And this is an individualized thing, because the court would have to look at where each person signed up for Facebook, where their photo was taken. Why? I don't understand that. I mean, that's obviously your argument in theory, but I don't see any reason why the district court would have to agree with that. The district court said that the named plaintiffs, as well as all the proposed class members, are located in Illinois, and their claims are based on the application of Illinois law to the use of Facebook, mainly in Illinois. So what's wrong with that? I know your argument is that, well, other things happen outside of Illinois, but I'm not sure why that prevents an Illinois class from being formed. Because it's a balancing test, Your Honor. You have to look at the extra-Illinois factors and the in-Illinois factors. There's multiple things wrong with the excerpt that you read. One is that it's very circular. The district court rejected Facebook's California choice of law clause and said, I found that plaintiffs validly assented to it, but I'm not going to apply it. So the court then had to apply all of Illinois law, including this strong extra-territoriality doctrine. I would urge the court to look back at the Avery case. In that case, you had an Illinois defendant who issued insurance policies from Illinois, and the court said the only class you could possibly certify here is one of Illinois residents who had their cars serviced and repaired with the substandard parts in Illinois. So you need all of those different factors. Here, you have Facebook doing the analysis, which is an essential element of liability under the Graham case, outside Illinois. You have Facebook being located outside Illinois. The photos of the plaintiffs are uploaded all over the world. In a different context, the district judge rejected the plaintiff's proposed class definition based on an Illinois upload, and he said, not every upload results in the collection of biometric data, so a class defined by uploaded photos is too amorphous and over-inclusive. Let me ask two questions before you read on. One regards the Commerce Clause, because it really seems that Facebook is objecting to what may be beyond Illinois management of Facebook's biometric, whether it's capturing or the use of that, but it's absent from the pleadings. Maybe an amicus of Facebook mentions it, but you didn't, your colleagues on the other side didn't. Is there some reason that's not briefed? The reason why that's not briefed is that the Dormant Commerce Clause interests are protected by the Illinois extraterritoriality doctrine. Illinois made a decision, and it said, we are going to regulate in-state violations of this statute. And by doing that, the Illinois Supreme Court decided, sorry, the Illinois legislature decided that it would only apply its statute within its own borders. When the district court decided to apply Illinois, it had a duty to apply that doctrine, which means that this statute can only be invoked in situations where all the circumstances arose primarily and substantially within the state. Yes, if the court does, and the Dormant Commerce Clause is in our answer in this case, and it is preserved. But if the court properly applies the extraterritoriality doctrine, there is no Dormant Commerce Clause problem. Let me ask this, because I know you're burning time, and it's the second part of my question. Why don't you just stop doing it in Illinois? I mean, apparently, this biometrics, they aren't captured and used for tagging in Canada and some other places, possibly in Europe. Why not make that adjustment, or would that be too great a concession? A couple of problems with that, Your Honor. First of all, we don't think that the statute applies to this because it excludes information derived from photographs and because Facebook's software is not within the statute. Also, we believe that Facebook's disclosures are sufficient to comply with BIPPA, even though Facebook didn't have to. But the question here is not why Facebook isn't turning off the feature in Illinois. The question is whether Facebook had to turn off the feature in Illinois, but that's a question for trial. Right now, the question is whether this class can be certified, and it cannot. But the fact that Facebook pushes back so strenuously against this being a class case surprises me. Even in your reply brief, you cite to the hundreds of BIPPA class action matters pending. I mean, we're in an age where class action cases probably are more pervasive than individual action cases. Slight exaggeration. And it's allowed. Even Avery acknowledges that unless it's absolutely not allowed, class action typically is. No, Your Honor. Rule 23 says the exact opposite. It's a departure from the general rule that the parties litigate individually. We have a whole section in our brief explaining why. And I would like to understand it, because as it's written, I don't agree with it. Well, the other BIPPA class actions show why this one is not appropriate. The BIPPA class actions that are described in the amicus briefs show that most of these cases are very cohesive. They involve a dispute between an Illinois business and its employees or its customers. And everything happened in Illinois, and the class numbers are all situated the same. But isn't it a fact that the statutory damages are so slight that no individual will pursue them, at least not meaningfully? So unless it's a class action, Facebook will not be called upon to answer? Well, no, Your Honor, because an individual plaintiff could easily sue. The statute does apply, does provide. But, prudence, is it worth the wait for the $1,000 or the $5,000? But, Your Honor, that's not the question on Rule 23. The question on Rule 23 is whether the elements of Rule 23, predominance, commonality, superiority, are satisfied. And our position is that they are not here. Your overtime. Counsel, Judge, could I interject a question? Of course. Please, if we can let counsel have an extra minute or so in the argument, I'd appreciate it. Could you please advise us of your position on superiority, which I think is mentioned in your briefing, but you haven't really addressed here? Thank you, Your Honor. Our position on superiority is that a class action is not superior because it could result in a multibillion-dollar award here in a case where the plaintiffs agree that they were not harmed, and that that violates both due process and this Court's precedence. There is nothing in the Illinois statute or in the Rosenbach case to suggest that the Illinois General Assembly intended to create the potential for this type of annihilating class action for a procedural violation of the statute's notice and consent provisions. The legislature wanted to encourage the development of these technologies. It intended for the statute to be used the way it's been used in Illinois, to regulate these in-person collections of biometric data. We don't really know what Illinois legislature's intent was, one way or the other, so which way does that cut? Well, if you don't know, we submit that you do, that the findings give the Court a very good clue as to what the legislature intended, as well as the history of the statute. But if you don't know, the presumption is always that this type of annihilating class action, the Supreme Court has said it, Seventh Circuit said it in Cohen. I didn't see Bateman saying that. Bateman says that there... I didn't see a presumption in there. Maybe I missed that. Well, in Bassett, this Court noted that the line in Bateman about dissuading, about class actions being useful for dissuading procedural violations of statutes may be abrogated by Spokio. So that calls Bateman into question. But even Bateman recognizes that when you have these annihilating damages, in a case where there is no real injury, where people could opt out, they can quit Facebook, their data can be deleted, that is not a proper use of Rule 23. Okay. Any further questions, Judge Gould? No, thank you. Okay. We'll give you a minute for rebuttal. Thank you. Good morning, Your Honors. Good morning, Judge Gould. May it please the Court, my name is Aaron Lawson. I represent the appellees and the class. I'll begin with the standing issue because, of course, it's foundational here. And I would also, like my colleague representing Facebook, like to begin with paragraph 34 of the Rosenbach decision. Because in that paragraph, the Illinois Supreme Court holds that when an entity collects biometric information without providing the proper notice or obtaining the required consent, that the precise harm the statute was intended to prevent has been realized. Well, what's the effect of the state court's analysis of its own statute, of the state statute, on our constitutional inquiry? We're not bound by that, right? Well, sure. So Rosenbach, of course, said nothing directly about Article III. But I think what it said about the statute is incredibly important because we know from the Supreme Court's decision in Spokio that an injury, in fact, is still just an invasion of a legally protected interest that meets certain other criteria, such as being concrete. But isn't it opposing counsel correct that in the privacy cases, there's always been an element of disclosure? This is a different sort of claim, that there's an invasion of privacy with no disclosure and apparently the face maps are destroyed after a certain period of time. So how do we find an injury without the disclosure element? So, a couple of responses. First, although the in-circuit cases all discuss disclosure, we've cited in our papers a couple of out-of-circuit cases, including from the 8th Circuit, that discuss unauthorized collection itself being a concrete injury, in fact. But this Court's decision on remand in Spokio itself tells us that we need to look at what the underlying substantive concrete interest that the enacting legislature intended to create is and whether the statutory violations at issue harm or risk harming that interest. And we know from Rosenbach that one of the underlying substantive concrete interests protected by the Biometric Information Privacy Act is this meaningful right to say no to the collection of this information. So when it's collected without proper authorization, that harm has been realized. The individuals whose information has been collected have suffered the harm that the legislature intended. Spokio directs us to look at traditional common law type rights. I don't know that there is a common law right to not have your face mapped and stored. Sure. So the Supreme Court said we can look to two sources of guidance to determine whether an injury is concrete. One of them is the common law. We would submit, as this Court said in Eichenberger, invasions of privacy have long been actionable. One of the sort of classic privacy torts is the misappropriation of likeness, the unauthorized use of your face. Spokio also says we can look to the judgment of the enacting legislature because as the Court recognized long ago in Lujan, legislatures have the ability to identify new problems that aren't addressed by the common law and to address them through remedial legislation that allows for private rights of action. And that was really the teaching that Spokio keyed off of when it talked about looking to the judgment of Congress. And Rosenbach tells us that is exactly what we have here. The legislature recognized that the common law wasn't protecting this information, but it needed such sensitive special information that it needed special protection. So it provided that protection, and when this information is collected without proper authorization, the precise harm has occurred. So we're not in a risk of harm world, which sort of distinguishes Bassett and Duda and many of the FCRA cases that we've been discussing this morning. And it may also explain why, at least to my reading, your papers don't do much at all with the theory, the material risk of harm. Right. And do you agree that you've waived it? It sounds as if you've purposefully avoided it. We have avoided it, I think, only because the harm has already been suffered, and that's what Rosenbach tells us. But if we were to agree with your opponents on the other side that BIPA is designed to protect disclosure as opposed to invasion, do you have enough before us for us to consider that alternate theory? I think we do. I mean, the fact that Facebook has this information itself presents a risk of harm, but Rosenbach tells us that the harm that the statute is intended to prevent has already occurred. So we're much closer to Eichenberger, whereas your Honor recognized this court said, you know, privacy torts do not always require additional consequences to be actionable. The harm there wasn't the disclosure. As far as Spokio is concerned, what mattered was that the statutory violation itself caused the harm that the statute was intended to protect against. It didn't matter that it was disclosure. It happened to be disclosure. So opposing counsel points out that the class reps in their deposition say, at least one of them says, this is a nice feature, I wouldn't turn it off. And the other two had the feature on even until after their depositions. And so obviously there's no experience to them of harm. They have opted in or they have not opted out of the feature. What do we do with that? Well, as we point out in our papers, they do all testify that they find this practice to be invasive of privacy. But, again, I'd go back. The harm, they've all been deprived of or were deprived at the beginning of their right to say no to the collection of this information. And because that is the harm, it really is immaterial what happened afterwards. So we would have to say that the scan, since the BIPA itself excludes photographs so photographs alone are not covered, we would have to say that the mapping of the photograph so that they have the logarithm or whatever it is that says what your face is, that that itself is an invasion of privacy and BIPA is intended to give notice and consent. So what supports your argument, other than the fact of BIPA itself, that that mapping constitutes an invasion of privacy without more? Well, Rosenbach. I mean, I don't want to sound like a broken record, but I think that is the point of the decision. I mean, and it says a couple paragraphs later, right before the excerpt Your Honor read earlier, that the point of the statute is to ensure that these rights are properly honored and respected at all times, even at collection. So Illinois, the General Assembly made this determination that we need a comprehensive scheme to protect these privacy rights. So tell us then, at precisely what point do you, your clients, believe the invasion occurred? When the information is collected. So it's, as you know, we've been given at least four steps that make up this collection process. So when you say when the information is collected, can you lead me to one, two, three, or four at the conclusion of four maybe? So as we put in our summary judgment papers, we think that the collection happens at least by the classification stage, although this is still a live dispute in the district court, right? I mean, it's one of the major common issues we have here is whether and when this information is biometric information. But we've put forward evidence that this collection is of biometric information without consent. And that gets us over that. Well, but then that brings us to the position, I think, Facebook's counsel recently and eloquently made. Your client could simply opt out at that point in choosing not to, which at least in the eyes of Facebook destroys at least one element of your class standing. But not in the eyes of the General Assembly. And I think that's more important for Article III, that this harm, this deprivation of the right to say no to this collection has already happened, even if you can opt out after the fact. And that's why we have standing and can move to the merits of these claims. So this also verges on Judge Pearson's question on the extraterritoriality issue. Yes. So that if the information, so the uploading of the photos, I don't think anyone argues that that alone constitutes biometric data. So it's something that happens when the photographic information is processed.  Right. And I think that's unrebutted as well. So why shouldn't we say that the violation occurs where the information is developed, which is the invasion of privacy? Sure. So if I could just provide some context before my answer, and I will directly answer your question, but this is really just a very small piece of the overarching question of whether the district court abused his discretion in concluding that common issues predominate. And I'm not entirely sure that the extraterritoriality point is really central to his exercise of discretion because he recognized that all of the core liability issues that we have here, whether the terms of service provide adequate notice and whether this automatic enrollment with the opportunity to opt out is informed written consent, and whether the information is a scan of face geometry or information derived from a photograph, that is all, those are all common questions he found on this record. That hasn't been challenged. The reason, and he said this at summary judgment, the exact reason he certified the class was then, after that, he found that the statute doesn't require anyone to submit evidence of additional adverse consequences by virtue of the word aggrieved in the right of action. So those are the two pillars on which his discretion was really exercised. And it's against that backdrop that we come to the extraterritoriality issue,  but I think we, whatever we do with that, we're leaving intact the nub of his reasoning. But to your question, the district court, actually let me take another step back. So Avery is, in Avery, the trial court certifies a 50-state class. And the task on appeal in the Illinois Supreme Court was to determine when non-Illinoisans could avail themselves of Illinois law because all 50 states had been certified under the single body of law. And what the court was doing was looking for the kinds of things that Illinois could appropriately regulate. That's really the genesis of this primarily and substantially test. We want to know when the circumstances of a claim arise such that it makes sense to apply Illinois law. So I'd begin just by saying it makes, there's really no genuine dispute that Illinois is entitled to regulate what happens on the Internet within the borders of Illinois. And that's really what's going on. So we have the server location. And the judge, the district judge recognized that if we're to focus on server location, we really override Illinois' ability to regulate the Internet within its own borders. It would also result, he pointed out, in sort of nationalizing the legislative judgments of that state, overriding those of every other state, which is not an outcome we really want. It's sort of antithetical to the genius of our interstate system. And so he reasonably rejected it for that reason. But I'd also point out that this focus on location really doesn't advance the ball nearly as far as Facebook wants it to go. I'm just a little surprised that your clients conceded so easily to the extraterritorial effect or the lack thereof when the statute itself begins almost by referencing major national corporations. And I'm not sure that Avery supports your position, which happens to be equal to that of Facebook's, that it is only active within the boundaries of the state of Illinois. Well, so I think this finding about major national corporations is incredibly important, as the district court pointed out. I would disagree about Avery because Avery explicitly discusses the fact that the dissemination of unlawful conduct, and there we're talking about fraudulent statements, but I think the principles still apply here, that the location from which these things are disseminated shouldn't necessarily control. And in this instance, a lot focusing on server location kind of cuts both ways because this facial recognition pipeline isn't activated absent the use of Facebook in Illinois. And the results of this analysis are sent back to Illinois. And Avery tasks trial courts with sort of pondering these imponderables and determining whether the violations can be appropriately subject to Illinois law. And there's really, I don't think there's been a showing that the court erred in making that determination here. Can I take you back to predominance or a common question? If the issues persist and there being distinguishing points between one client and another, can those be resolved down the road? You may have heard me ask your colleague on the other side this, maybe through a claim form or some additional discovery. What's your response to that? We certainly think they can. And I think it's incredibly important that the district court has really approached these issues as an issue of case management. You know, we see him at the notice hearing talking about, you know, we're just sending notice. We're not writing checks. We have a lot to do before we get there. We might never get there. He recognizes that the facts that the jury finds are going to have an incredible impact on how we end up managing this issue, so it makes sense to see what happens there, especially given the substantial common issues we have to try. And he also recognized he has continuing discretion to modify the class definition as appropriate. But we've also seen on several occasions in this case the depth and breadth of information that Facebook is collecting on each individual user, which will make it very simple to really thoroughly audit any claims that come in, in a way that the district court deemed to be manageable at this stage. On this record, he found it to be manageable, and there's really no showing that that was an abuse, that conclusion at least was an abuse. So I think we can resolve these issues down the road to the extent they come up. If there are no further questions about extraterritoriality, I just want to address Judge Gould's concern about superiority. Bateman really focuses on legislative intent and whether a class action which might have a huge damages award is consistent with the intent of the legislature or Congress that enacted the particular statute. And we know from Rosenbach that substantial damages are part of the point here, right? That it's intended to be sort of a deterrent that if you're collecting on a mass scale biometric information from a group of people, that they can band together in a meaningful class action that really has some teeth. So under Bateman, we definitely have – this is definitely a superior means of adjudicating the controversy. So opposing counsel argues that there's certainly indications in the findings, as Judge Pearson noted, the reference to national corporations. And there is legislative history indicating that Illinois legislature was not opposed to this sort of use of biometric data and in fact wanted to facilitate it and have the notice and consent as just a facilitating endeavor. But if there are these sorts of huge damage awards, that's going to be a deterrent from the use of this data. How do you respond to that? So I think the dilemma facing the General Assembly was not do we allow this in some instances or more instances, but in some instances or none at all? Because if you're to take seriously some of the other findings, the wariness about entering into these transactions and the substantial irreparable harm that can occur, you would just not allow it, sort of like we've done here in San Francisco where we do not allow facial recognition at this point. So instead, we erect this scheme which allows for its use but ensures that we put the rights of Illinoisans first. And that's sort of what Rosenbach is telling us especially, that we're making sure these rights are respected and honored at all times. So the class action I think makes a lot of sense in that context as well because you're only going to reach this kind of perhaps troubling judgment. I don't find it troubling, but I know some do, if you have proven that an entity is collecting this information without putting the rights of Illinoisans first in contravention of the statute. So I don't think that at all detracts from the superiority of this class action in addition to the substantial common issues that we'll be trying at the trial. And to the due process point, we don't have a judgment yet, so it's premature to even consider whether class certification by itself, this annihilating judgment, would violate due process. That's a bridge we can cross when we come to it. I think Bateman suggests that we presume damages are compensatory, but based on what you've just argued, it almost makes it sound as if you believe the statute's damages would be punitive and intended to be that way. Did I understand you correctly? Well, I don't believe that they're punitive. I think the use of the term liquidated in the statute indicates that they are intended to be compensatory. The General Assembly was faced with a choice of what value to put on these rights, and it chose a number that it found to really put some teeth into the law and which also respects these rights in the way it thought they should be respected. I mean, you see there's a lot of sort of hand-wringing about how important this stuff is, and I think that supports the notion that we should have, you know, that $1,000 is a reasonable liquidated sum for a violation of this kind. If there are no further questions, we'd ask the Court to affirm, and I'll yield the remainder of my time. All right. Thank you. You have a minute for rebuttal. I'll do the best I can. Thank you, Your Honor. Turning first to extraterritoriality, it has to be expressed in the statute under Avery, which is why every court to look at this has concluded that BIPPA does not have extraterritorial effect. That's Graham and Avery that hold that. That hold that it has to be expressed in the statute. Turning to that major national corporation sentence, the district court, when it quoted that sentence, left out the rest of it, which says major national corporations have selected the city of Chicago and other locations in this state as pilot testing sites for new applications. That actually demonstrates that the legislature was focused on conduct happening in Illinois. I want to talk for a second about why none of this can be resolved through a claim form. The plaintiffs came in and proposed a class definition that would have turned on an Illinois upload. Judge Donato looked at that, and he said, no, you can't do that, because I can't tell whether a photo was uploaded from Illinois. I can't tell whether facial recognition was applied to it. So you can't define the class that way. Then the plaintiff said, well, you can presume that if somebody is an Illinois resident and they have a lot of photographs of them that have been uploaded, you can presume that some of them were subjected to facial recognition. He said, no, I can't do that either. It's inherently imprecise, and plaintiffs don't offer any statistical or other methods that would translate. Can I just finish this one quick point? Thank you, Your Honor. Then he said a vigorous claims process cannot fix these problems because Facebook will have no greater ability to resolve these uncertainties at the verification stage. So what he was saying was that if you start adding factors to the class definition, the case will be unmanageable, and you will have to have many trials on all of these issues about where the plaintiff's claim arose. That's why he went with residency, and our position is that that was an error of law under Avery, and thus is not entitled to any deference. Okay. I thank both sides for their argument in this interesting case, and this case is submitted and we're adjourned for this session. Thank you, Your Honor.
judges: Gould, Ikuta, Pearson